Judgment rendered September 27, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,240-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

HIGHLAND CLINIC, A
PROFESSIONAL MEDICAL
CORPORATION

Plaintiff-Appellee

versus

MANISH DHAWAN, M.D.

Defendant-Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 623,512

Honorable Ramon Lafitte, Judge

* * * * *

MCMICHAEL & CARTER, LLC
By: James C. McMichael, Jr.

Counsel for Appellant

DAVID LYNN WHITE

Counsel for Appellee

* * * * *

Before STONE, STEPHENS, and MARCOTTE, JJ.

MARCOTTE, J.

This appeal arises from the First Judicial District Court, Caddo Parish, the Honorable Ramon Lafitte presiding. Defendant, Dr. Manish Dhawan, appeals the trial court's ruling awarding $189,147.66 to plaintiff, Highland Clinic, a Professional Medical Corp., regarding an employment contract dispute. For the following reasons, we affirm the trial court's ruling.

## FACTS AND PROCEDURAL HISTORY

On April 27, 2020, Highland Clinic, a Professional Medical Corp. ("Highland" or the "Clinic"), filed a petition against Dr. Manish Dhawan ("Dr. Dhawan"), an oncologist, for breach of an employment contract. The petition asserted that Highland and Dr. Dhawan entered into an employment contract on September 1, 2002, in which Dr. Dhawan was hired to operate clinics, referred to as "cost centers," in Caddo Parish, Louisiana, Minden, Louisiana, and Natchitoches, Louisiana. Highland was to pay Dr. Dhawan an annual salary with quarterly bonuses, but if Dr. Dhawan did not earn enough money in his cost centers to pay his annual salary, he would be indebted to Highland for the difference, which was to be paid immediately upon his termination.

Dr. Dhawan voluntarily left his employment with Highland on August 31, 2019. The petition alleged that, prior to leaving his employment, Dr. Dhawan was setting up his own medical practice, to be operated independently from Highland. There were days that Dr. Dhawan would not perform procedures at the cost centers, and Highland alleged that he owed the Clinic a significant amount of money. Highland, over the course of months after he terminated his employment, provided Dr. Dhawan documentation of the amounts he owed plus drug rebate credits he was

entitled to receive from certain pharmaceutical companies; Dr. Dhawan refused to pay any amount owed to Highland and asked for more time to respond. Highland alleged that Dr. Dhawan owed it $205,390.15, along with legal interest, expert witness fees, and court costs.

Dr. Dhawan answered the petition and denied Highland's claims. He pled extinguishment of the obligation and set off.

Dr. Dhawan filed a pretrial brief in which he argued that he was one of Highland's highest earners until he gave notice that he was terminating his employment, at which point the Clinic began charging him unauthorized charges that reduced his net income and led to the net loss Highland alleged. He stated that his expenses during his last few months at Highland were inflated and that he continued to treat a "full complement" of patients in the last few months of his employment with the Clinic.

Dr. Dhawan stated that Highland leased a building from him, and under the lease, the Clinic was obligated to maintain the building and equipment, including the generator. Dr. Dhawan alleged that Highland did not properly maintain the generator, and when the building lost power after August 31, 2019, the generator failed to work and he lost drug inventory due to a loss of refrigeration.

Dr. Dhawan asserted that Highland received over $1.2 million in CARES Act[1] Provider Relief Funds that were calculated in part using his 2019 Medicare receipts. Dr. Dhawan complained that those funds were intended to compensate qualified providers of healthcare services for

---

[1] The CARES Act is the "Coronavirus Aid, Relief, and Economic Security Act," an economic stimulus bill passed by Congress and signed into law on March 27, 2020, in response to the economic consequences of the COVID-19 pandemic in the United States.

2

healthcare-related expenses or lost revenue due to COVID-19. Dr. Dhawan argued that he continued to treat his patients after he left Highland in 2019 and he incurred expenses and lost revenue due to COVID-19, but the Clinic did not remit any funds to him.

Highland filed a pretrial brief and stated that it reduced the amount it sought from Dr. Dhawan to $197,847.66, because it credited certain drug rebates that it received following his employment termination. Highland explained that Dr. Dhawan earned significant amounts of money at the Clinic and that his deficits were "insignificant" prior to his last month of employment with the Clinic. In August of 2019, during his last month of employment with the Clinic, Dr. Dhawan incurred significant losses which accounted for the majority of the debt he owed to Highland. Highland stated that Dr. Dhawan was using office time to set up his own medical practice, was over-ordering supplies, and "was generally more attentive to outside activities during the month." Highland averred that the deficit was created by Highland advancing draws to Dr. Dhawan against his production.

On September 17, 2021, Dr. Dhawan filed a reconventional demand stating that he was entitled to be paid by Highland for the CARES Act Provider Relief Funds that the Clinic received based on his 2019 Medicare fee-for-services payments it collected while he was employed there.

On September 30, 2021, a bench trial was held where the following evidence was adduced. Lisa Edge ("Nurse Edge") testified that she is a registered nurse and she worked at Highland as practice manager for the Hematology/Oncology Clinic from 2017 to 2019. She stated that Dr. Dhawan was a "little distracted" in August 2019 and would not spend enough time with his patients; he would spend little time in the exam room

3

and then would "be on his cellphone," which was a change from how he was prior to August 2019. There was a significant reduction in the number of patients that Dr. Dhawan saw and treated from June to August 2019, in the three locations where he practiced for Highland.

Nurse Edge testified that consultants were present at Dr. Dhawan's office in the last few months of his time at Highland. The consultants were present to assist Dr. Dhawan in setting up his own practice. Nurse Edge also stated that Dr. Dhawan was ordering an excess of medical and office supplies, about which she emailed Michael Gustavson ("Gustavson"), Highland's chief financial officer. The supplies ordered were reduced. She said that Dr. Dhawan would have been charged for, and Highland would not have suffered any loss because of, the supplies he ordered.

Lauren Scheffy ("P.A. Scheffy"), a physician's assistant in the Oncology Department at Highland, testified that Dr. Dhawan was less focused on patient care in the last two to three months he worked at Highland. She saw a decrease in the number of patients he saw and he spent a lot of clinic hours on the phone when patients were in exam rooms. P.A. Scheffy said that his clinic was cut short by several hours on days Dr. Dhawan was in the Shreveport office so he could leave to attend meetings. In the last few months of Dr. Dhawan's tenure at Highland, there were consultants who came to his clinic and met with employees to ascertain what their job duties were in order to prepare a manual of job descriptions and responsibilities. P.A. Scheffy realized the consultants were his transition team after Dr. Dhawan announced that he was leaving Highland.

P.A. Scheffy testified that prior to May 2019, prescriptions were filled in Highland Oncology's in-office pharmacy, but after Dr. Dhawan

4

announced he was leaving, prescriptions were filled through a specialty pharmacy outside of Highland. P.A. Scheffy affirmed that if Dr. Dhawan ordered prescriptions through a non-Highland pharmacy, his production would have increased for the months he did so, because the Clinic was not charging him for those medicines.

Miranda Lambka ("Lambka"), the purchasing manager for Highland, testified that she saw an increase in the supplies that Dr. Dhawan purchased in the last two to three months that he was employed by Highland. In some orders, she saw a doubling of the usual amount for items, which led to her having difficulty keeping some items in stock. She said the expenses for orders at the Shreveport and Minden locations were split between Dr. Dhawan and Dr. Koticha, who worked in the Oncology Department with Dr. Dhawan. Dr. Dhawan was charged for any supplies he ordered.

Gustavson, Highland's C.F.O., testified that under Dr. Dhawan's employment contract, he was compensated twice a month, which was referred to as a "draw." The draw could not be set at more than 70 percent of his previous year's W-2 earnings. Dr. Dhawan was paid a quarterly bonus for any additional income he generated in excess of the amount of his annual draw less any costs or expenses he incurred. Section 5.04 of Dr. Dhawan's employment contract with Highland was admitted and stated:

> If, at the end of any fiscal year of the Corporation or as of the cessation of Stockholder Physician's employment by the Corporation, the Year-to-Date Profit of the Stockholder Physician is for any reason a negative amount, the Stockholder Physician shall be indebted to Corporation for such negative amount, which shall be paid to Corporation by Stockholder Physician within the first calendar quarter of the succeeding calendar year, except that any negative amount existing as of the date of cessation of Stockholder Physician's employment shall be due and payable in full on that date.

If any physicians working for Dr. Dhawan were paid by Highland more income than they generated, Dr. Dhawan was responsible for the shortfall. Gustavson met with Dr. Dhawan several times about certain compensation concerns, and he said that Dr. Dhawan had a "solid understanding of how the compensation formula worked." Dr. Dhawan was Highland's highest producer, but the cost of chemotherapy drugs is very high, so while Dr. Dhawan's billings were high, they were offset by the price of the drugs he administered.

Gustavson said that Dr. Dhawan's normal billings for one month ranged from $1 million to $1.5 million. Gustavson testified that drug manufacturers provide rebates based on purchase levels, but the rebates are not paid until up to a year after the drug was purchased. Dr. Dhawan requested of Highland's board of directors that he be allowed to receive those drug rebates after he left, which ordinarily would not do. The board agreed, but only after the rebates came through the Clinic to offset any loss he had with Highland. Gustavson testified that Dr. Dhawan left Highland with a loss of $197,847.66, which was the final figure offset by the drug rebates. Gustavson sent Dr. Dhawan two letters about the shortfall and the amount he owed Highland; those letters were admitted.

Gustavson received emails from Nurse Edge and Lambka about Dr. Dhawan over-ordering supplies; he asked them to reduce the amount of supplies ordered for the Minden and Shreveport offices. Gustavson said that Dr. Dhawan was also using working capital to purchase inventory for a new venture, which was not something Highland was willing to do.

Gustavson said that Dr. Dhawan was potentially pushing infusion of pharmacy dispensing services out into September 2019, which was revenue

that would not have come through Highland. Gustavson said that Dr. Dhawan denied doing that. Each month Dr. Dhawan's office would purchase chemotherapy drugs up through the end of the month, but there were some drugs that were not given to patients until the next month. In order to match the revenue with the expenses, Dr. Dhawan asked Gustavson to "hold back" a certain amount of drug expense, which appeared as a credit to his cost center which would then be reversed the following month. In July 2019, roughly $75,000 in drug expenses was held back in Dr. Dhawan's cost center and then reversed the following month.

Gustavson also testified about write-offs that were included in the final calculation of what Dr. Dhawan owed Highland, explaining that an expected insurance company payment would be entered into the Clinic's billing system, but often the payment the Clinic received from the insurer would be less than that expected amount, and the difference was written off, decreasing a physician's production amount. Dr. Dhawan also purchased drugs from Highland's dispensing pharmacy in the amount of $145,557.93 that were only for his patients. He took those drugs with him when he left Highland, so that figure was included in his cost center.

Gustavson next testified about the CARES Act funding Highland received first in April 2020, and again in May 2020. Highland received $1.2 million in Phase I of funding. Gustavson said that the federal Department of Health and Human Services arrived at the figure by taking a percentage of all providers' Medicare billings "as a way to get the money out the door quickly." The conditions placed on providers receiving money through the CARES Act were that the funding could only be used to "prevent, prepare for, and respond to Corona Virus, and that the payment shall reimburse the

7

recipient only for healthcare related to expenses or lost revenue that are attributable to Corona Virus." Gustavson testified that there was nothing in Dr. Dhawan's employment contract that justified Highland crediting him for money the Clinic received from the CARES Act.

Gustavson confirmed that Dr. Dhawan's Medicare billings were included in Highland's Medicare billings which were used to calculate the amount of its Phase I CARES Act funds. Gustavson acknowledged that Highland did not incur COVID-related expenses for Dr. Dhawan's patients and that he only received CARES Act funding for his new practice based on his Medicare billings for September to December 2019.

Gustavson testified that for any write-off that is not applied to a physician's cost center before he leaves Highland's employment and for which the Clinic is never paid, Highland absorbs that loss and does not apply it to the account of the physician that left. For any write-off that is applied to a physician's account which is ultimately overpaid by an insurer after a physician leaves his employment, Highland keeps that additional payment and does not forward it on to the physician.

When asked if it was to Highland's benefit to be as aggressive as possible on write-offs before a doctor left the Clinic, Gustavson disagreed and said that the methodology of choosing write-offs remained the same in Dr. Dhawan's case. When asked if he had a list of what was written off, Gustavson responded that he did not have that information with him. He said that he did not think he would be questioned about write-offs, because that issue had not come up before.

Gustavson testified that he had a conversation with Dr. Dhawan in mid-August 2019 informing the doctor that his production at that time was

approximately $600,000. Defense counsel noted that Dr. Dhawan's production went down from mid-August 2019, to the end of August 2019. Gustavson attributed the decrease to corrections made in insurance company billing, where a charge was initially billed to one insurer when it should have been billed to another, and write-offs.

Gustavson said that Dr. Dhawan's year-to-date write-offs for 2019 totaled $647,555.59, which was larger than his normal write-off, "but as a percentage of $9 million, it's not an unusual amount for a physician who's leaving." Dr. Dhawan averaged about $25,000 in write-offs per month prior to August 2019. In August 2019, his write-offs totaled approximately $466,564. When asked why that amount was so much larger than Dr. Dhawan's average monthly write-offs, Gustavson said it represented charges that were denied by insurance companies that Highland was not able to collect or patient accounts that were sent into collections. Once the money was written off, Highland made no further effort to collect it.

Gustavson said that normally Highland tried to spread those write-offs out so they did not impact a physician in one month or one quarter, but when a physician resigns, Highland is unable to spread them out any longer. Gustavson did not provide a report showing how the $466,564 write-off figure was obtained. He said that Dr. Dhawan's large number of write-offs in August 2019 were for bills that occurred, and for which he was paid, over many months before he left. Gustavson also said that Dr. Dhawan was also debited for write-offs attributed to the two other doctors in his Highland practice and a physician's assistant.

Dr. Dhawan had admitted a spreadsheet that Highland produced in discovery showing that the amount of his write-off in August 2019 was

9

$466,564.27. He had another spreadsheet admitted, dated September 12, 2019, showing the amounts from various insurers that were written off, which totaled $466,564.27.

William Cole ("Cole") was accepted by the trial court as an expert certified public accountant and testified as an expert familiar with the CARES Act, and he discussed a report generated by Chad Garland ("Garland"), a forensic accounting expert of Dr. Dhawan's. He stated that the Medicare service payments generated by Dr. Dhawan in 2019 contributed to the CARES Act Phase I funds that Highland received in 2020.

Cole said that Dr. Dhawan should not have received reimbursement based on his 2019 Medicare payments. Cole stated that the government wanted to get the Phase I funds out as quickly as possible once the COVID pandemic began, so it looked at the 2019 Medicare billings of providers as a means to easily determine what each provider would receive. Cole said the 2020 CARES Act funding was for 2020 expenses and it included conditions; if those conditions were not met, providers were required to return the funding. The funding could only be used to prevent, prepare for, and respond to the COVID pandemic, which began in 2020.

Garland's report stated that Dr. Dhawan was ineligible to receive additional CARES Act funding, because the funding was based on his 2019 taxpayer identification number sent directly to Highland. Cole disagreed with that part of Garland's report stating that the report omitted that Phase II funding was available for those who did not receive Phase I funding. Cole did not know if Dr. Dhawan was eligible for Phase II funding, if Highland used all of its CARES Act funding as required, and whether the Clinic had to return some of the funding to the government. The plaintiff rested.

10

Garland testified that Highland received approximately $1,227,000 in the first wave of CARES Act funding. He stated that by his calculations, of that Phase I funding, $310,252.50 was based on Dr. Dhawan's Medicare billings for 2019. The CARES Act funding was "to be used by doctors…so that they could stay afloat and keep operating." Garland testified that Highland benefited from the government not knowing that Dr. Dhawan had left his employment with the Clinic, but he said he did not know if Highland would have received less money if it had known Dr. Dhawan left.

Garland testified that he was unaware if Dr. Dhawan filed for Phase II CARES Act funding. He acknowledged that Highland could not write a check for more than $300,000 out of its CARES Act funding, because "that way they would have been breaking the law." Garland said that he did not inquire whether Dr. Dhawan qualified for any funding beyond what was provided in Phase I.

Dr. Dhawan testified that he was busy in the last few months of his employment with Highland in 2019. He was trying to maintain continuity of care for his patients with his new practice, and was attending to the needs of his upcoming practice, which he called "complex." More than 90 percent of Dr. Dhawan's patients came with him to his new practice.

Dr. Dhawan stated that his nursing staff oversaw ordering supplies, not him, and he was not in control of how Highland divided expenses for supplies ordered by him and the other doctors. Dr. Dhawan stated that Medicare requires that when chemotherapy is administered, a doctor must be present in the building, so he hired two doctors in order to have enough physicians at each location where he practiced. Dr. Dhawan was responsible for their losses and profits, and he said, "[W]e had a large amount of outgo

11

for them every year from my cost center." Dr. Dhawan described the arrangement as "financially challenging" for him.

Dr. Dhawan stated that Gustavson never explained to him what write-offs were and that they could suddenly go up when a doctor leaves his practice. Dr. Dhawan attributed his lack of production in August 2019 to the write-offs and not due to his seeing fewer patients. He said that chemotherapy is not something that could be put off, so he was not going to ask his patients to wait until he had his new practice established. Dr. Dhawan discussed his production with Gustavson in mid-August 2019, and he understood that his production was where it typically was by the middle of the month.

Dr. Dhawan stated that he was surprised that his final production was $511,000, which left him with an approximate net loss of $271,000 (after the drug rebates were applied to his loss). Dr. Dhawan stated that the final write-off that Highland applied to his account was $466,564.27, which surprised him, because this total write-offs in 2018 were less than $200,000. Dr. Dhawan stated that he was not involved in the business side of his practice, which was handled by Highland.

Dr. Dhawan said that he understood the CARES Act funding was to help physicians to keep their offices open. He received about $150,000 in Phase I of the CARES Act, calculated using the 2019 Medicare billings from his new practice.

Dr. Dhawan testified that he leased his Minden building to Highland and the tenant had the responsibility of maintaining the premises. The lease expired after September 1, 2019. There was a storm in Minden approximately one week later; the electricity to the facility went out, but the

12

generator did not provide back-up power. Dr. Dhawan stated that he lost refrigerated medications that could not be kept cold. He attributed the fault to Highland, because the generator had not been maintained as required. He said that the medication was not insured. Highland assisted Dr. Dhawan in constructing the building and was aware that there was a generator there. Dr. Dhawan affirmed that if there was a need for maintenance on the building, he would contact maintenance personnel at Highland to go to the Minden office. He said the day-to-day maintenance of the building was Highland's responsibility.

Dr. Dhawan had admitted the lease agreement between Highland and the owner of the Minden building, Tolstoy Farms, LLC, an LLC of which Dr. Dhawan is the sole member. The lease agreement stated that Highland was required to maintain the premises, including the fixtures and facilities, for the duration of the lease.

Dr. Dhawan stated that in his last few months at Highland he had people come to his practice to help write job descriptions for his employees. Dr. Dhawan testified that he had approval from Highland's administration to do so. He also acknowledged that he received drug rebates.

Stacey Bounds ("Bounds") testified that she is the financial director of Dr. Dhawan's new practice and she worked previously as a payroll administrator for Highland. She joined Dr. Dhawan's new practice in September 2019. Bounds reviewed Dr. Dhawan's cost center reports at Highland and said that the amount of his write-offs for August 2019, of more than $466,000, was very unusual given what his write-offs had been in the past. Bounds said write-offs were common for physicians, but not in such a large amount as Highland charged Dr. Dhawan.

13

Bounds stated that Highland's lease on the Minden building expired five days before the building lost power in September 2019. She did not send Highland documentation of the drugs that were lost.

Renae DeMoss ("DeMoss") testified that she is the practice manager at Dr. Dhawan's new practice, she previously worked for Highland as the clinic coordinator in Dr. Dhawan's office from 2004 to 2014, and she assisted him in setting up his new practice. DeMoss said that Dr. Dhawan's production, expenses, and patient visits were the same in August 2019 as the months before, but the write-offs that Highland applied to his cost center greatly reduced his net production. Bounds said that Highland never explained what payors had been written off and why. Dr. Dhawan's gross adjusted production for 2019 was $9.1 million and his write-offs were more than $647,000, or seven percent. His gross adjusted production for 2018 was over $10 million, and his total write-offs for the same year were about $160,000, or a little over one percent.

DeMoss said that she did not know if the write-offs charged to Dr. Dhawan in August 2019 were write-offs that Highland attempted to collect but was not able to collect. DeMoss said that she had seen Highland charge write-offs of that magnitude when two other physicians left the Clinic.

DeMoss said that the generator at Dr. Dhawan's Minden practice failed to turn on after a power outage in September 2019 and many drugs became unusable due to loss of refrigeration. The practice had to absorb the cost of repurchasing the drugs, which was $30,987.30. According to DeMoss, there was insurance on the Minden building, but no insurance claim was filed to cover the cost of the lost medication. When asked

14

whether Dr. Dhawan's new practice notified Highland about the $30,987.30 worth of lost medicine, DeMoss said, "Maybe not."

When asked by the trial court if Dr. Dhawan received enough information from Highland to determine what amount of money Highland owed Dr. Dhawan or what amount he owed the Clinic, DeMoss said, "No."

The parties stipulated that the generator at the Minden building failed because it was not properly maintained. The defense rested.

Gustavson testified as a rebuttal witness. He stated that no one in Highland's administration was aware of a generator at the Minden office. Typically, if there was ever a maintenance issue, the office would call Highland's plant department, which would then address the issue. Gustavson said that no one from Dr. Dhawan's office notified Highland about a generator or lost drug inventory.

On June 2, 2022, the trial court provided oral reasons for judgment. The trial court summarized the testimony and found that there was a net loss of $197,847.66 when Dr. Dhawan left Highland's employment. The trial court denied Dr. Dhawan's claim for reimbursement for the lost drug inventory. The trial court found that there was no evidence provided to support the amount Dr. Dhawan sought, he did not file an insurance claim, Highland was not aware of the generator failure, and it was the usual practice for personnel in Minden to inform Highland when maintenance was needed, and they did not do so here.

The trial court stated that Dr. Dhawan could not receive any portion of the Phase I CARES Act funding because the funds were to be used solely to prevent, prepare for, and respond to Corona Virus, and payments had to be

15

used only for healthcare-related expenses or lost revenues attributable to Corona Virus.

On June 16, 2023, the trial court signed a judgment which stated that Dr. Dhawan owed Highland $197,847.66 and Highland owed Dr. Dhawan $8,700,[2] rendering a judgment in favor of Highland in the amount of $189,147.66 with legal interest. The trial court also ordered Dr. Dhawan to pay costs and expert witness fees. Dr. Dhawan now appeals.

## DISCUSSION

*Burden of Proof and Write-offs*

In his first assignment of error, Dr. Dhawan states that the trial court erred in finding that his write-offs exceeded the income he earned at Highland in 2019. He states that Highland improperly charged him with write-offs in that year, mostly in the last month of his employment. Dr. Dhawan argues that Highland failed to carry its burden of proof at trial that the write-offs were legitimate, despite having the necessary records in its accounting system.

Dr. Dhawan asks that this court reverse the part of the trial court's ruling finding that he owes Highland $197,847.66. He states that his total write-offs for 2019 were $657,555.29, and that his total write-offs for August 2019 were $466,564.27. He claims that he should be awarded judgment that he ended his employment with Highland with a net surplus of $211,421.92. He claims that with credits for drug rebates, the total he is

---

[2] The trial court found that Highland improperly applied an early termination fee for a waste management contract to Dr. Dhawan's cost center and credited him in the amount of $8,700.

16

owed is $314,857.59, and he asks this court to award him that amount under his employment contract.

Highland argues that the write-offs it applied to Dr. Dhawan are fair and were only applied after exhaustive efforts to get them paid. The Clinic argues that Dr. Dhawan was already compensated for those uncollected billings which had not yet been written off by the time he left Highland's employment. Highland claims that while Dr. Dhawan filed a motion to compel to acquire CARES Act documentation, he did not request documents from the Clinic related to write-offs.

Highland argues that Gustavson offered to discuss any financial documentation with Dr. Dhawan after he left the Clinic, but he did not respond to Highland's offer. Highland also points out that Dr. Dhawan did not hire a certified public accountant to review the documents he received from it, and he did not hire a CPA to testify at his trial. Highland states that Bounds and DeMoss were not employed by Highland in 2019 and their testimony regarding Highland's procedure for write-offs and the length of time the Clinic took before writing off the bills as uncollectible or because insurance would not pay was solely conjecture. Highland asks that the trial court's ruling regarding what Dr. Dhawan owes it be affirmed.

A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. Contracts have the effect of law for the parties. La. C.C. art. 1983. The interpretation of a contract is the determination of the common intent of the parties, giving the words of the contract their generally prevailing meaning. La. C.C. arts. 2045, 2047; *Best v. Griffin*, 50,445 (La. App. 2 Cir. 2/24/16), 190 So. 3d 333. When the words of a contract are clear and explicit and lead

17

to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046.

A party who signs a written document is presumed to know its contents and cannot escape its obligations by claiming that the other party did not explain it or that he failed to read it or understand it. *Coleman v. Jim Walter Homes, Inc.*, 08-1221 (La. 3/17/09), 6 So. 3d 179; *Best v. Griffin, supra*.

The courts are bound to enforce the contract as written. *Id.* In an action for breach of contract, as in all civil matters, the burden of proof is upon the plaintiff to establish by a preponderance the elements essential to recovery. *Id.* The essential elements of a breach of contract claim are (1) the obligor undertook an obligation to perform, (2) the obligor failed to perform the obligation, and (3) the failure to perform resulted in damages to the obligee. *Hayes Fund for the First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mt., LLC*, 14-2592 (La. 12/8/15), 193 So. 3d 1110.

A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Spencer v. Valero Refin. Meraux, L.L.C.*, 22-00469 (La. 1/27/23), 356 So. 3d 936. To reverse the trial court's determinations, the appellate court must find that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Id.*

Section 5.04 of Dr. Dhawan's employment contract with Highland obligated him to pay any debt that he owed from his cost center as of the date of cessation of his employment with Highland. Dr. Dhawan argues that

18

Highland failed to meet its burden of proof in showing that he owed the Clinic a debt and was in breach of contract for not paying that debt.

Gustavson testified that physicians' write-offs were spread out by Highland, so that they would not be burdened with a high write-off in any one month, but continuing to do so was not possible when a physician left the Clinic and was no longer producing. Dr. Dhawan had spreadsheets admitted that Highland provided to him in discovery, which showed the amount of his write-off for each insurer and the total amount of his write-off for August 2019, which was $466,564.27. DeMoss stated that she had seen the Clinic charge two other physicians with high write-offs when they left Highland's employment, so such a practice was not unusual.

Nurse Edge and Lambka both testified that Dr. Dhawan was distracted and not producing as much in his last few months at Highland. They also stated that Dr. Dhawan was spending time with consultants and seemed more interested in setting up his new practice than in seeing patients in his last few months with the Clinic. They also testified that he was over-ordering supplies. Dr. Dhawan testified that he was very busy in those last months before he left Highland, trying to preserve continuity of care for his patients with his new clinics and concentrating on the demands of his upcoming practice.

Highland had admitted letters between Dr. Dhawan and Gustavson, in which Dr. Dhawan requested information about particular entries on his cost center revenue and expense report for August 2019. Yet, in those letters, Dr. Dhawan did not seek information about the write-offs charged to his cost center in August 2019. Gustavson testified that no one requested

information about the write-offs or asked that Highland justify that figure until the date of trial.

Once Highland produced evidence of the amount of the write-off, it was incumbent upon defendant to then offer evidence showing that the figure was inaccurate, which Dr. Dhawan did not do. DeMoss testified that Highland provided inadequate information regarding what Dr. Dhawan owed Highland; however, the record shows that Dr. Dhawan did not make additional discovery requests or file a motion to compel in order to garner additional discovery about how Highland arrived at the amount of his write-off for August 2019. Dr. Dhawan had a forensic accountant testify about the CARES Act, but he did not have an expert testify about the financial documents that Highland provided.

We find that Highland met its burden of proving that Dr. Dhawan owed plaintiff a debt and was in breach of contract for failing to pay the Clinic what he owed it. The trial court was not clearly wrong in this matter and this assignment of error lacks merit.

*CARES Act Funding*

In his second assignment of error, Dr. Dhawan states that that the trial court erred in not concluding that he should be given credit against any money he owed Highland under his employment contract for CARES Act funds the Clinic received attributable to his 2019 Medicare production. He argues that he continued to treat his patients after he left Highland and incurred the expenses for which the CARES Act Provider Relief Funds were designed to compensate. Dr. Dhawan asks this court to award him $310,252.20 in CARES Act funds that should have been paid to him.

20

Highland argues that Dr. Dhawan is not entitled to any Phase I CARES Act funding, because conditions placed on the funding required that the money only be used to combat Corona Virus, for healthcare expenses, or lost revenue. Dr. Dhawan and Highland are engaged in an employment contract dispute, which does not meet with the CARES Act funding terms and conditions.

Congress established the Provider Relief Fund in the CARES Act to reimburse, through grants or other mechanisms, eligible health care providers for healthcare-related expenses or lost revenues that were attributable to Corona Virus. *See* Pub. L. 116-136 (2020). Acceptance of any funds was subject to terms and conditions which included that recipients certify that their payments would only be used to "prevent, prepare for, and respond to coronavirus, and the payment shall reimburse the recipient only for health care related expenses or lost revenues that are attributable to coronavirus."[3]

Both parties' experts agreed that Highland could not legally pay Dr. Dhawan from its CARES Act funding. The terms and conditions placed upon receipt of CARES Act Provider Relief Funds required that the funding only be used to respond to Corona Virus. Cole testified that the amount of Provider Relief Funds the Clinic received was based on 2019 Medicare receipts as a means of calculating the figure quickly in the face of a looming pandemic. The funds were intended for the facility or provider who made the funding request, which was not necessarily the provider who generated the Medicare receipts used to calculate the amount of the funding. Dr.

---

[3] https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-provider-relief-30-b.pdf

21

Dhawan was required to make his own funding requests, which he did, receiving Phase I funding. The trial court was not clearly wrong in denying his claim regarding Highland's CARES Act funding. This assignment of error lack merit.

*Generator Failure and Lost Drug Inventory*

In his third assignment of error, Dr. Dhawan complains that the trial court erred when it concluded that Highland had not failed to maintain the Minden office's generator, resulting in lost drug inventory. He states that it was Highland's responsibility to maintain the generator under its lease with him, which it did not do, resulting in more than $30,000 in lost drug inventory. Dr. Dhawan asks this court to reverse the part of the trial court's ruling regarding the lost drug inventory, and that he be awarded $30,987.70.

Highland argues that it is not responsible for the drug inventory that Dr. Dhawan lost due to a generator failure at his Minden facility. The storm which caused the outage occurred after Highland's lease ended, Dr. Dhawan never filed an insurance claim to cover the loss, he did not notify Highland about the lost drug inventory, and no one at the Clinic was notified that generator maintenance was required. Highland asks that the trial court's ruling be affirmed.

The lease contract itself is the law between the parties; it defines their respective rights and obligations so long as the agreement does not affect the rights of others and is not contrary to the public good. La. C.C. art.1983; *Carriere v. Bank of Louisiana*, 95-3058 (La. 12/13/96), 702 So. 2d 648.

Under the terms of the lease, Highland was required to maintain the premises for the duration of the lease, and the parties provided testimony that the power failure occurred after the lease terminated. Gustavson

22

testified that he was unaware of any generator at the Minden building or that it needed maintenance. Dr. Dhawan did not testify that he inspected the premises, which he owns through his LLC, prior to setting up his practice there, or that he had the generator serviced upon taking control of the premises. As the owner of the facility, he was aware that the building ran on generator power when there was a power failure. Dr. Dhawan also did not inform Highland that he had lost drug inventory, and he did not file an insurance claim. The trial court was not clearly wrong and this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed. Costs of the appeal are assessed to appellant.

**AFFIRMED.**